Case number 09-1017 et al. Waterkeeper Alliance et al. Petitioners v. Environmental Protection Agency Mr. Tone for Petitioners National Pork Producers Council et al. Mr. Smith for Petitioners Waterkeeper Alliance et al. Ms. Zoellick for Respondent EPA and Mr. Skinner Thompson also for Respondent EPA. May it please the Court, my name is Jonathan Smith with Earthjustice for Environmental Petitioners and Environmental Interveners. I'd like to make four points today. First, EPA's rule is in direct conflict with CERGLA and EPGRA. Second, the rule undermines the public health purpose of these statutes. Third, the rule irrationally treats facilities differently even though they emit the same toxic substance. And fourth, my clients have standing because this rule increases their risk of harm to their health and to the enjoyment of their property. Okay, so can you start with standing? Yes, Your Honor. So, my clients suffer nausea, burning airways, decreased lung capacity, and other ailments. And these are all symptoms associated with exposure to ammonia and hydrogen sulfide which can come from these industrial livestock facilities. When fumes are bad, my clients run indoors. They can no longer hold parties outside on their property. For example, Jason Champ says his daughter doesn't want to live on their property anymore because the fumes and odors are so bad. But without reporting... So, your argument is that there are health effects, but I thought that your standing under CERGLA was based on informational standing. Petitioners here have two bases for standing. Petitioners have standing based on health effects and an additional basis for standing for informational standing. But without reporting from these facilities, my petitioners face an increased risk of harm to their health and enjoyment of their property. As EPA has recognized in the record at J57 and as studies have shown, such as the study cited in the Declaration of Bebo Ruiz, there's a clear connection between reporting emissions and reduced emissions. So, facilities that have to report have incentives to reduce their emissions. So, without this reporting requirement, my clients face an increased risk of these increased emissions and an increased risk of harm to their health and their enjoyment of their property. And in addition, without the information in these reports, my clients can't take action to protect their health. They can't avoid the highest emitting facilities, and they can't try to work with these facilities to try to reduce emissions from the dirtiest facilities. And your claim on the information, let's say you're linked to a claim causally, turns on FOIA on one hand and the practice of EPA on the other. Is that roughly correct? That's partially correct, Your Honor. These circular reports actually go to the Coast Guard's National Response Center. It's not the EPA that receives these reports in the first instance. Then the Coast Guard's National Response Center conveys these reports to any other federal agency or state government agencies, for that matter. And it is the Coast Guard's National Response Center that makes these reports available to the public on its website for easy access and in one location. And is that enough, the website, if they're just doing it as a discretionary matter, putting it on the website? Yes, they're doing it because they feel that this is critical to the comprehensive regulatory system created by these statutes, including CERCLA, where public access to these reports is implicit in the regulatory scheme of CERCLA. Can I just ask this question? Because there seems to be an association between EPGRA and CERCLA, in that if there's a report that's required to be submitted under CERCLA, it then becomes something that's required to – something has to happen with it under EPGRA, too. Yes, that's correct, Your Honor. EPGRA requires that if a particular release requires a report under CERCLA, then that release also requires a report to state and local agencies under EPGRA. And if it requires a release to state and local agencies under EPGRA, is that public? Well, the statute does require that those reports – so there's a phone call first, and then within 30 days the facility has to do a follow-up report. And those follow-up reports are to be made public. But the fact of the matter is those follow-up reports aren't easily accessible. My clients would have to submit numerous public records requests with state and local agencies in order to obtain those reports. No, I think this is actually – it may be a point in your favor, which is what I'm trying to understand is, even if the CERCLA report isn't itself public – I get that the Coast Guard apparently is making it public, but even if it doesn't require to do that, the question is, if it nonetheless has to be made public under EPGRA, then it would suggest that as a matter of informational standing you may be – you may have an advantage because the publication may come from EPGRA rather than CERCLA. But if the report has to be submitted under CERCLA, and then the consequence that begets is it becomes public under EPGRA, then you gain an advantage from requiring that the report be submitted under CERCLA because of the publication under EPGRA. Yes, these reports are essentially the same whether they are reported under CERCLA or EPGRA, and EPGRA does require that these reports be made public. EPGRA does require that, okay. Yes. And to get back to the merits, if I may, this is a quintessential Chevron step case, Your Honors. The text of the statute is clear that any facility must report any release of a hazardous substance into the air, and industrial livestock facilities are no different. Nothing in the statute allows EPA to create the exemption it created here, and Congress knows how to create exemptions when it wants to, and it simply didn't do that here. EPA admits this at JA-614. So is your argument fundamentally that our decision in Alabama Power, now nearly 40 years old, was wrong? Creating a de minimis exception. Your Honor, I'd first point out that EPA in the rulemaking did not state that it was creating a de minimis exception. It invokes the word de minimis, and it certainly never cites Alabama Power. On the other hand, the language that it does use, which may be erroneous, the language that it does use fits pretty closely into the terms of Alabama Power. That is to say, a requirement which is burdensome and fruitless. That's their argument. I think you've pointed to a number of facts which make that questionable as a matter of fact, but that's their fear. Yes, Your Honor, but there's nothing de minimis about these releases. By EPA's own estimate, three-quarters come from these facilities. Although, you do not say that under the terms adopted by EPA, it does look as if it met community standards in the sense of being costly and fruitless. Well, I do hate to handle a hypothetical in regard as contrary to fact, but we do that all the time to explore the scope of the statute. So, to return to the statute, Your Honor, there's nothing in the statute that would allow EPA to create de minimis. Which would be true in Alabama Power. Nevertheless, Your Honor, the statute already has a de minimis exception baked into the regulatory structure. Well, that leads to another question. As I understand it, EPA has chosen to identify reportable quantities consistently across most possible variations that you might think of for any particular substance. But as far as I can make out, that was EPA's choice, and it might have made a different choice. In fact, it hints here at how the source of these emissions is such that it claims nothing could be done about it. And that's one of the elements of pointlessness, which is not true for all kinds of other sources. Well, Your Honor, nothing in – well, to return to CERCLA, Your Honor, CERCLA allows EPA to set different reportable quantities based on the medium into which a release is made. So, for example, a release into water could have a different reportable quantity versus a release into air.  There's nothing in CERCLA that suggests that EPA can create a different reportable quantity based on the source of a release. And further, I'd also – So I suppose it's true that there are certain sources for which, at least below a certain level, emissions coming from them are completely unremediable. In that situation, then perhaps a possible diminutive exception would apply, but that's not the situation we have here. Well, all I'm suggesting is what you're arguing. I think in practice is the factual basis for a diminutive exception does not exist. Well, by the very existence of these hazardous substances, EPA has already determined that these substances are hazardous. And by the setting of the reportable quantity, EPA has already determined that there's some quantity at which – above which there's a cause for concern for these substances. I think it depends how you can refine that further. That it's a substance which is hazardous at particular volumes, but maybe that's not inconsistent with the special circumstances which make reports pointless. Which you argue, I understand, are not present here. So, again, Your Honor, the mere likelihood of an emergency response is not the only purpose of these statutes. So it's impermissible under the statute to say that a reporting is pointless just because an emergency response is unlikely, especially when the statute expressly allows it. What if there were no response, which would possibly do any good? Yes. Well, given the statutory structure, it envisions that it's not merely an emergency response that's the only remedial action or the only purpose of these reports. It's the mere fact that there's a one – like no, quote-unquote, emergency response is likely or possible for a specific release. It's not the need to report. There might be other things which justify it, despite the absence of any possible emergency response, but which were absent in the case of these emissions. Well, couldn't you envision a scenario – I mean, I guess the question is, is there a gap between a hypothetical de minimis exception that would work and the possibility that this involves a real de minimis exception? In the following sense, if a finding were made that said that from certain sources, emissions of this level just don't present a danger. They just don't. And the same level of emissions from a different source does present a danger. Now, I can't hypothesize why that would be the case, but let's just suppose that's the case, that the nature of the source of the emission affects the degree of danger. Then it could be that you would have a de minimis exception, even though the degree of emissions was the same, because by hypothesis, it coming from certain sources would be viewed as de minimis. So, again, Your Honor, that is a possibility, but that's not the case that we have here. And EPA, in this rulemaking, specifically says in the response to comments at J622 that this rulemaking was not based on health or risk. EPA made no such assessment that these emissions were, in fact, de minimis, in the sense that they would not cause harm to humans. Right, so they disclaim health or risk. Yes. Now, what if they say health or risk is the same, but for some sources, it's just incredibly costly to respond. For other sources, it's not that costly. And so we're going to train our resources on the ones for which we can give a more efficient response. And it's de minimis in that sense, that it's just not worth it to respond to the same level for some sources because the costs are prohibitive, whereas we can more efficiently expend our resources and achieve the same environmental advantages by rooting out the emissions elsewhere. Again, Your Honor, that is a possibility, but that's not the case we have here. Okay, so it's all about what we have. Or, in fact, the National Association of State and Local Agencies said that they were opposed to the exemption because they wanted these reports. And I also note that the record does include numerous actions that these facilities can take to reduce their emissions. They can change livestock diet. They can change their manure handling and storage practices. So it's in progress. It actually would be productive to get the reports, in other words. These emissions are not remediable. Are there no further questions? Thank you. May it please the Court, David Chung on behalf of National Pork Producers Council and the U.S. Poultry and Ag Association. EPA found, and the record supports its finding, that it is unlikely there will ever be an emergency response to notifications about hazardous substances released into the air from animal waste at farms of all sizes. Given that EPA has long recognized that the purpose of EPCRA Section 304 notifications is to enable emergency responses, it was arbitrary and capricious for EPA to require notifications from larger farms merely because some people want that information. By doing so, EPA relied on a factor that Congress did not intend for it to consider. The record in this case is clear. No one has indicated they would likely take an emergency response to the type of notifications at issue here. At the federal level, EPA said that it cannot remember an instance where it undertook an emergency response action and that it cannot foresee ever doing so in the future. Numerous state and local emergency response agencies likewise said that they had not and would not initiate an emergency response action. They explained that they simply have no use for the information that would be in these notifications. They generally know where the farms... That's some of the submissions, but it's not all of the submissions from the EPA. Some of the submissions, the National Association of Sierra Title III, for example, shows great interest in having these reports submitted, having access to them. Judge Williams, you're correct that that association expressed an interest in receiving the information, but they never once indicated that they would likely undertake an emergency response. In terms of the substance of the comments, they provided one example as to why the reporting exemption might harm the integrity of the response programs, and that was the example of the 911 call that comes in the middle of the night that prompts the emergency responder to drive around blindly. But number one, that example just proves the point that had they received an immediate notification, they implied that they would not drive around and undertake a response. On top of that, the example... Because they indicate the reporting is important because if they had an immediate notification, then they would know that there was no purpose in getting in their car and driving around and trying to figure out the source. The implication is that they would know what the source is. No, they specifically say EPA says there would not be an emergency response, and then the comment letter goes on to say that's only in the case if we knew it was coming from a farm. On top of that, it's a purely hypothetical example. The association that theoretically represents every state and local emergency response agency nationwide doesn't give any concrete evidence that this scenario has actually occurred. On top of that, it rests on a false premise. They imply that if they had an immediate notification of the farm, they would know what to do. But the evidence in this case, including even Waterkeeper's admission in the reply brief, shows that the agencies will not be receiving immediate notifications because these farms would qualify for reduced reporting obligations under the continuous release reporting provisions. So under any scenario, they're not going to have immediate notices. And then finally, the example just doesn't make sense. There's no way to be certain that what a 911 caller is complaining about is necessarily the same release incident that you might receive from a contemporaneous notification. It's not as if only one possible release can occur at any point in time. Returning to what the state and local agencies emphasized about the uselessness of these reports, they indicated that emissions estimates are not accurate because there's no current methodology that can reliably estimate these emissions. On top of that, they generally know where the farms are and that often farms can smell. But more importantly, they expressed concern that receiving notifications about air releases from animal waste at farms could actually hurt their reporting programs by diverting resources away from potentially serious emergencies. That's a concern that this court found compelling in the Fertilizer Institute v. EPA decision, which is why it left a comparable reporting exemption in place during a remand for the EPA to address a procedural issue. Why isn't it as serious? If you have the same level of emissions for the same substance, I get that one of them is coming from a farm and my hypothesis is one of them is coming from a plant. But just why isn't it? Why is it not as serious? What's serious is whether it warrants an emergency response. The finding with respect to larger farms is regardless of what the level of emissions may be, there is no reasonable approach for an emergency response. Council for Waterkeeper indicated that there are things that farms can do to reduce emissions, but reducing emissions is not the purpose of these emergency notification provisions. What these emergency notification provisions are designed to do is to give immediate notice to the emergency responders so they can make a timely decision on whether to respond. If in the long run there are certain measures that may be taken to reduce emissions, that doesn't answer the question of whether they can immediately undertake a response action and whether there's anything that can feasibly be done at the time of the release. EPA's finding that it is unlikely there will ever be an emergency response to the type of notifications at issue in this case is controlling because it amounts to a finding that such notifications do not serve the purpose of EPCRA Section 304 notifications. EPA has long recognized that the purpose is to facilitate emergency responses. In the 1998 rulemaking on exemptions for radionuclide releases, EPA directly refuted the notion that EPCRA Section 304 was intended to inform the public. EPA explained that the purpose of reporting under EPCRA and CERCLA is to enable emergency responses. It did not mince words when it said, quote, Those reporting programs are not intended to serve as a source of information for the public, at Joint Appendix 125. Even in this rulemaking, in response to comments, at Joint Appendix 624, EPA said, quote, EPCRA Section 304 notifications were not intended to be used to track emissions, end quote. And in response to a comment that Congress intended for the public to know about these sorts of releases, EPA stated at Joint Appendix 619 that the intent of EPCRA Section 304 notifications is to enable emergency responses. It said nothing in response to that comment about providing information to the public, much less that the statute clearly reflected any sort of purpose about informing the public. With respect to the issues raised in Waterkeeper's petition about EPA's authority to establish reporting exemptions, to Judge Williams' point about the de minimis doctrine, we agree that that is functionally the equivalent of what EPA did in this case. This Court has long held that the literal meaning of the statute need not be followed if following the precise terms would lead to absurd results, or if the failure to allow a de minimis exemption would be contrary to the primary legislative goal. Whether something is a de minimis deviation from the statute has to be judged in terms of what the purpose of the underlying statutory requirement is. Waterkeeper is incorrect that this does not qualify for a de minimis exemption merely because the extent to which some of these releases might exceed the reportable quantity that's set forth in a regulation. The proper way to apply this doctrine is to ask whether excusing one narrow type of release, i.e. air releases, from one specific type of source, i.e. animal manure, urine, or flatulence, from one specific type of facility, i.e. farms, is a de minimis deviation from the broader general requirement that facilities report releases under CERCLA or EPGRA. Farms still have to report air releases from other sources, such as if an ammonium tank explodes. Farms still have to report releases about animal waste into the groundwater, for example, or surface water. And other facilities that may have air releases from animal waste still have to report. So in sum, the de minimis exemption, although EPA did not specifically reference it or cite Alabama power, certainly applies here as our intervener brief explains. Thank you. Good morning. May it please the Court. My name is Jonathan Skinner-Thompson on behalf of the U.S. Environmental Protection Agency. With me at Council's table are Ms. Erica Zilioli with the Department of Justice and Mr. Eric Swenson with the EPA's Office of General Counsel. I plan to use the first five minutes this morning to address standing and jurisdiction, and my colleague, Ms. Zilioli, will use our remaining time to address the merits. Now I'd like to focus on Waterkeeper's two theories of standing and make three points. First, Waterkeeper fails to establish any informational injury under Section 103 of CERCLA and even concede on page 3 of their reply brief that CERCLA does not require that release reports be conveyed directly to the public. That concession can't be squared with fellow entertainment, which requires claimants to espouse a reading of the statute that provides them a direct entitlement to the information they seek. Waterkeeper can't do so here because section... That was pretty good information for a private entity, right? That's correct. Yeah. This is different. Well, I think what that case essentially held, and when it read Aikens as well, is that they need to produce some interpretation of the statute which provides them with a direct legal entitlement, and there is no legal entitlement under Section 103. The plain text, I think... Yeah, but even in our most restrictive standing cases, if there's a high probability that the conduct that the person is suing against is causing the harm, that's enough. I think that's actually more appropriate. There are two requirements that need to be shown, and the first threshold question is whether there's a legal requirement to receive the information. The second question is whether there's any utility in receiving that information. That's what merits. I think... And I don't see why the merits need to be framed in that way. Well, I think for standing purposes in the informational standing case law, there may be no question as to whether there's any useful utility to having this information, but they still haven't established that they're required to receive the information. I'm not sure why you put that as part of the standing requirement. We're talking about Article III injury in fact, right? And if the claim is meritorious, the argument is certain consequences will flow. We'll get better if we get the information we used to get, and that's usually enough. But I think the initial question is whether they should be getting or are required to get that information in the first place, and I think they haven't really presented a case for interpretation of statute here that would require the National Response Center or the EPA to convey those reports to the public. I take it you don't dispute that they would get the reports. Well, I think they would have to either go online, as they've noted, or request the information through a FOIA. So go online. I mean, that doesn't sound like a big obstacle. Everybody goes online every day. Sure. The fact that the National Response Center voluntarily aggregates the information I don't think is enough here. I think they need to be able to identify a statutory interpretation that actually requires either the National Response Center to post the information or that requires the EPA to post the information, and they concede that there is no requirement under CERCLA to post the information. I think it may be good policy that the National Response Center does, but it's certainly not a legal requirement. Even if that were true, even if the fact that as a matter of fact they could get it on the Web wouldn't be enough, what about EPCRA? One point of clarification, I think, which you asked earlier this morning, Judge Friedenhoff, Section 324 actually requires follow-up notifications to be publicly available, but the notifications that are provided under CERCLA and EPCRA are the initial notifications which aren't mandated to be disclosed to the public. It's actually those under EPCRA, the follow-up notifications, that must be provided to the public. Well, even if that's why, isn't that enough? Well, there's no similar provision under CERCLA that requires. But I think, in other words, the CERCLA triggers a follow-up notification requirement under EPCRA. And that's also not necessarily true because EPCRA reporting can be triggered under a variety of different circumstances. It's not just if there's a CERCLA notification. But CERCLA does do that. It may be that, if I'm following you correctly, there may be other reasons that EPCRA also has a notification requirement. But I don't think this Court has ever found or imported a legal requirement under another statute to find information. But I'm just not understanding why wouldn't we? Because if they win under CERCLA, your argument is, well, CERCLA doesn't require any report be made public under CERCLA. And then if the response is, okay, well, CERCLA might not. But winning under CERCLA would get at least some reports public under EPCRA. If it automatically falls as a matter of course, why does it matter that formally it comes from another statute? Well, I think the cases have been pretty clear that they actually have to identify that, within that particular provision, that there's a requirement. But I just don't understand why would we limit it to that particular provision? If it just follows as a matter of law that it's got to be made public under some other statute, for Article III purposes, I get a benefit. Different reports, actually, that are provided. And I think maybe to go back to the Section 103 reports, these are often just telephone communications to the agency. And there's no actual written report that's provided by the third parties to the NRC. Under EPCRA, the third parties are, after they've provided an initial notification required to generate a new report, these follow-up notifications, and those reports are then required to be public. But there's not a similar requirement under CERCLA to do something like that. Okay. You were going to also address their second standing argument. Sure. And so the waterkeeper's health-based claim is also insufficient because, in light of the record, there's no basis to conclude that any of the alleged physical harms would be redressable by a favorable decision. And as EPA explained in the rule that joined Appendix 6 and 5, EPA has never initiated a response action to any Section 103A notification. There is material in the record that some changes in practices of these harms would have effects, intending to reduce the emissions. I think that that's speculative. And I think the ultimate justification that the waterkeeper puts out in their brief is that state agencies might or could take some action. But the record actually supports the opposite conclusion. EPA concluded that state and local agencies were unlikely to respond to a release notification. And so they haven't actually demonstrated, I think, here for Article 3 purposes, that there would be a likely health benefit if this court were to find that the reporting exemption rule were unlawful. Good morning, and may it please the Court. Erica Zaglioli on behalf of the United States Environmental Protection Agency. If the Court reaches the merits in this case, the reporting exemption rule should be upheld for three reasons. First, Chevron deference is appropriate here. Congress gave EPA broad discretion to implement the CERFLA and EPFRA reporting requirements and left room for the agency to determine how best to carry out its authority. Thus, it is a permissible reading of the statutes for EPA to exercise its authority through implementing limited administrative reporting exemptions. Second, EPA's interpretation is consistent with the statute's primary purpose, legislative history, and the agency's own regulations. And third, this rule is reasonable because it avoids unnecessary burden on federal, state, and local agencies, as well as on covered farms, while still advancing the purposes of the statutes. Can I say, it looks like under the regulatory materials, the agency doesn't dispute that the same level of emissions begets the same level of harm. In other words, the agency's not saying that releases of ammonia from farms present lesser harm than releases of the same quantity of ammonia from somewhere else as to which there would be a response. I don't think EPA makes a formal finding on that fact here because the rule was not based on a finding about risk from these sorts of releases. So I don't think there's anything in the record that addresses that question. Right. So, which I think, I mean, I'm reading from JS 622 in the response to some comments. The exemptions, and this is EPA, the exemptions provided for CERCLA Section 103 and EPCRA Section 304 were not based on health or risk. EPA does not disagree with the comment that a toxic material is a toxic material and has the same health and environmental effects regardless of the source. So we take this case on the assumption that it presents the same level of risk. And if we do that, then what's the reason that there's not a response? It has to do with essentially the nature of these sorts of emissions. We're talking about essentially manure and other types of animal waste that are sitting in any number of different types of configurations. They could be in wastewater lagoons. They could be sitting on the floor of a barn. They could be spread on a field. You know, there are a number of different ways in which the waste is present at these facilities. And so EPA has to, you know, if they were to respond, they would have to come in and essentially, you know, the waste is still going to be decomposing. So the idea that there are so many factors that go into how these emissions are generated, geographic, the breed of animal, the type of feed, it would be virtually impossible and feasible for EPA to come in and make some sort of determination that any particular action could actually eliminate the cows generating this. If there were actions that farms could take to limit the amount of ammonia released by animal waste, is there any reason the agency wouldn't just tell farms, you know, you ought to undertake these measures because this creates a risk by hypothesis. It creates the same risk as the same release from some other source. And there's things that you can institute to minimize that risk. Here's what you should do. Under the, you know, the response, the idea of a response action is there's an emergency present, a threat to human health or the environment, and EPA or the local agency has some ability to come in and tell the farm to do something to reduce that risk or to eliminate the risk. Aside from basically shutting down farms, there's really no way to entirely... It's unclear, though, that given that these are ongoing, continuous releases, typically, that that's, you know, having some sort of change in the farm's, you know, waste management system could eliminate that risk. Well, so you think even the presence of spikes way above the reportable quantity doesn't contradict the proposition that nothing can be done? It's not inconceivable that there's a scenario where a response could be appropriate. EPA just hasn't encountered one in their, you know, 30 years or so of experience with dealing with hazardous waste management and risk. I guess my question would be how much is it explored? There's actually been an ongoing study to look at and try to capture how emissions are generated and how there may be an ability to calculate, because the fundamental challenge is you're dealing, again, with regional differences, geographic, climate, weather, types of animals. It's really hard, given the diversity and the variety of factors, for any farm, let alone for EPA, to try to come up with a reliable method of estimating and calculating these emissions. And so there have been studies that EPA has been undergoing. In our record, there's a reference to the National Academies of Science report that EPA commissioned along with USDA. And part of the goal of that was to try to figure out if there were appropriate ways in which to estimate the amount of emissions that were coming out of farms. And the study concluded, and this was back in 2003, that there really was no reliable method of trying to capture the amount of emissions and therefore having an ability to respond. Again, unless you know how much emissions there are, it's challenging, and that's why EPA cites the infeasibility of being able to respond, because you don't know how much and what could potentially be done to correct that. So you don't deny the proposition that it can be beneficial to the community to know where there's the requisite level of emissions from a farm? No, and that's why the rule has that carve-out under the EPRA provisions that requires the largest farms, the CAFOs, Concentrated Animal Feeding Operations, to report to the local agencies. EPA still concluded that local response agencies are not going to respond. They're very unlikely to respond. But it made that carve-out specifically to give credit to the comments from members of the public that said they were concerned about the CAFOs in their community. And so that's why EPA, in fact, under and appropriately under EPRA, considered the community's desire to have access to that information when it decided that the CAFOs are going to continue to report. And why is that desire not present with respect to non-CAFOs that release the same level of ammonia? Well, to some extent, it was really EPA's reaction to the record. The proposed rule would have exempted all farms from the EPRA reporting requirements, and EPA received public comments that indicated that people were concerned about these large industrialized farms. And those are the farms that are most likely to have the releases that would even exceed the reportable quantity to begin with. Farms, for example, that have free-range animals and where the animals are not confined, those types of farms aren't even covered by the rule. So most, when you think about the farms kind of out, just a few cows wandering around, those farms are not likely to reach the level of even having the report requirement in the first place. And that's why this rule... But the line between AFOs and CAFOs is considerably different from the line between free-range hens and most of the AFOs, right? Yes, the rule specifies the number of animals that are required in order to reach that threshold. Part of the record talks about the nature of how particularly industrialized farming has become. Most farms are likely to, of the industrial and commercial nature, could very well fall into those categories. So the communities are still going to be receiving that information. Even the local response agencies that Waterkeeper Alliance sites that wrote in, or their associations wrote in to say, we do want access to that information, they were commenting on the proposed rule, which would not have had that carve-out. So now they are getting access to that information. So we think those concerns have been alleviated. And again, EPA was reasonable when it considered those public comments because the secondary purpose of the EPCA reporting requirements is to allow those follow-up written reports that are more detailed. Those have to be provided to the public. So we think EPA was reasonable when it considered those comments that really were focused on the largest AFOs as opposed to the traditional AFO, smaller farms. And again, in response to concerns that have come up about the health risk and everything, EPA did not premise its rulemaking on risk of that nature. But I would point out that this rule is very narrowly targeted, and that's the reasonableness of having an administrative reporting exemption as opposed to just setting a reportable quantity at a very high level for all releases from different facilities and from different sources, is specifically to allow this to be a very narrow circumstance where EPA knows a response is not likely. EPA could have set an extremely high reportable quantity for ammonia and hydrogen sulfide, but the result of that would have been that they wouldn't have gotten the information they needed from other sources. Here, instead, they chose to call it an administrative reporting exemption, but really it's narrowly crafted for a very specific set of circumstances, and that's what makes this rule so reasonable. It does not apply to facilities other than farms. It does not apply to sources other than the natural production of these chemicals through the decomposition of waste. So if somebody does have a stack or another facility at their farm that is releasing this in a spike, that would still be required to be reported. So EPA was reasonable when it designed the reporting exemption in the way that it did, and that's why we maintain that the rule is reasonable. If there are no further questions, if the Court reaches the merits, we ask that you uphold the rule in its entirety. Thank you. Thank you. Okay, so no one had any time remaining. We'll give each of you a minute. To briefly address standing, it is this Court's precedent that it's not speculative to assume that companies will act in their economic self-interest when given the opportunity to do so, and companies that have to report it is in their economic self-interest to not be seen as bad actors in the eyes of government regulators, in the eyes of their investors, or in the eyes of the public. And in addition, plaintiff's standing based on harms to their health and enjoyment of their property is not solely based on the actions of others. It is also based in part on the actions that my clients, the petitioners, can take. They can avoid these high-emitting facilities as well. And I'd also note that a sample continuous release report is in the record at J534, and that continuous release report does use a calculation methodology that does exist to calculate approximately 1,000 to 2,000 pounds of ammonia emissions per day. So it's incorrect to say that no calculation tool exists for these facilities. I'll also note that these are not emergency notice provisions. The surplus specifically provides for release reports in the event of continuous emissions that are stable in quantity, such as perhaps most of the emissions from these livestock facilities, and that there are actions that these facilities can take to address continuous releases. If they can change the livestock diet, they can change the acidity of the manure pits. These can all affect emissions that are continuous and not necessarily only those spikes that the other parties have mentioned. And I note that pork producers seem to be claiming that these emissions are de minimis  where these facilities emit 1,000 pounds every single day. And we posit that that is not what the de minimis exception applies to. And finally, there are a number of purposes as recognized by EPA to this reporting, even aside from an emergency response. In addition to EPA's connection between reduced emissions at J57, we recognize that state and local agencies can use these reports to create new regulations or new permitting requirements. And also these surplus specifically allows that federal agencies can do other types of remedial actions, such as monitoring, assessment, or measures to prevent future releases and not just emergency response actions. Thank you. Thank you. Very briefly, Your Honor, the only points that I want to address are your concerns about what could be done to address the emissions from these farms. Two points. First, not every single release that exceeds a reportable quantity requires an immediate response. The purpose of these provisions, again, is to give information to the emergency responders so they can figure out whether to take a response. But that doesn't mean that every single release above a certain quantity for a certain pollutant constitutes an emergency. But more importantly, the reporting exemptions, as EPA made clear, don't affect its authority under other provisions of these two statutes, nor do they affect EPA's authority under various other statutes to address potential emission control measures. All this does is excuse emergency notification reports because something will not be done immediately as an emergency response. But there are ways to address emissions from farms, as EPA has done and as Waterkeeper points out in their comments, to address these emissions in the longer term. And on top of that, farms are regulated by states as well for that very purpose.  Thank you. The case will be submitted.
judges: Rogers, Brown, Griffith, Kavanaugh, Srinivasan, Williams